WARREN (STODDART v.). See Case No. 13,471.

## Case No. 17,200.

WARREN et al. v. TENTH NAT. BANK OF CITY OF NEW YORK et al.

[5 Ben. 395;[1] 5 N. B. R. 479; 42 How. Prac. 169.]

District Court, S. D. New York. Nov. 21, 1871.[2]

BANKRUPTCY — INVALID PREFERENCE — SUFFERING PROPERTY TO BE TAKEN ON EXECUTION — KNOWLEDGE OF INSOLVENCY.

1. The firm of E. P. S. & Co., on August 23d and 24th, 1870, gave checks to W. H. M. S., which he passed to a bank, and which were not paid on presentation at the bank on which they were drawn. In September, 1870, E. P. S. & Co. failed. On November 3d, the bank, as holder of the checks, commenced suit against E. P. S. & Co., in which suit judgment for want of an answer was entered on January 12th, 1871, and, execution being issued, the sheriff levied on the goods of E. P. S. & Co., on that day. Proceedings in bankruptcy being commenced against E. P. S. & Co., the court ordered the sheriff to sell under the executions, and hold the property subject to the order of the court. The assignees in bankruptcy, when appointed, filed this bill against the sheriff and the plaintiff in the execution, to recover the amount of the proceeds of sale. It appeared that, when the suit was brought, the president of the bank understood that E. P. S. & Co. had, some time before, compromised with their creditors at forty-five cents on the dollar, and that the prospect of their business was good. No other officer of the bank had anything to do with the transaction. At the time of the levy by the sheriff an attachment in favor of other parties had already been laid on part of the property levied on, but this was not known to the bank. *Held*, that the bank was put on inquiry by the non-payment of the checks, but that it did not appear that the bank had any reasonable cause to believe that the debtors intended, by suffering the execution to be levied, to give the bank a preference over any creditor who had a subsisting enforceable debt at the time;

2. What transpired after the levies were made could not affect the rights of the parties, and the bill must be dismissed.

[This was a suit in equity by Richard Warren and others, assignees of Edward P. Sanger and Walter Scott, bankrupts, against the Tenth National Bank of the City of New York and Matthew T. Brennan, sheriff. For a petition to review an interlocutory order refusing a trial by jury, see Case No. 17,201.]

A. Blumenstiel, for plaintiffs.

H. E. Tremain, for the bank.

J. Sterling Smith, for the sheriff.

BLATCHFORD, District Judge. On a petition in involuntary bankruptcy, filed February 24th, 1871, in this court, Edmund P. Sanger and Walter Scott were, on the 11th of March, 1871, adjudged bankrupts. The plaintiffs were, on the 11th of April, 1871, appointed assignees, and an assignment in the usual form

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[2] [Reversed in Case No. 17,202. Decree of circuit court reversed in 96 U. S. 539.]

was executed to them on the 14th of April, 1871.

The bill alleges, that, on the 12th of January, 1871, and within four months before the filing of the petition, the bankrupts, being insolvent, with a view to give a preference to the Tenth National Bank of the City of New York, which then had a claim against them, procured or suffered their property to be seized on two executions, amounting respectively to $4,803.47 and $5,051.01, issued out of the supreme court of the state of New York to the sheriff of the city and county of New York; that, under such executions, the said sheriff did, on the 12th of January, 1871, levy upon and seize the property of the said bankrupts; that such executions were obtained upon actions brought in the said supreme court by the said bank, to which the bankrupts interposed no defence, and in which they suffered and permitted judgments for said sums respectively to be entered against them on the 12th of January, 1871; that the sheriff, under the instructions of the bank, remained in possession of the property until after the filing of the petition; that, on the 11th of March, 1871, an order was made by this court that the property be sold under the direction of the sheriff, and that he hold the net proceeds of the sale subject to the further order of this court; that thereupon the property was sold at auction, and the net proceeds, amounting to $8,910.57, were received by the sheriff, who now holds the same under said order; that the bank refuses to release its alleged claims on the moneys, and its alleged liens under the executions; that, at the time of the entering of the said judgments, and of the issuing of the said executions, and of the said seizures thereunder, and of the said sales. the defendants had reasonable cause to believe the bankrupts to be insolvent, and that the executions and the seizures thereunder were issued and made and procured, or suffered to be issued and made, in fraud of the provisions of the bankruptcy act, and with a view to give the bank a preference, and to prevent the property of the bankrupts from coming to their assignees in bankruptcy, and to prevent the same from being distributed under the said act, and to defeat the object of, and impair, hinder, impede and delay the operation of, said act; and that the defendants withhold and detain the proceeds of the said property from the plaintiffs with the intent and object aforesaid, and in fraud of the said act. The bill prays that the said seizures and executions may be declared fraudulent and void; that the plaintiffs may be declared to be entitled to the possession of the property so seized or the value thereof, as assets of the bankrupts; and that the plaintiffs may recover the same from the defendants. The bill was filed on the 19th of April, 1871.

The question of fact principally contested in the proofs is, as to whether the bank, at the time the property of the bankrupts was taken on the executions, had reasonable cause to believe that the bankrupts were insolvent, and that the conveyance and transfer of the property of the bankrupts, made by such taking, was made in fraud of the provisions of the act, by being made with a view, on the part of the bankrupts, to give the bank a preference, or to prevent their property from coming to their assignee in bankruptcy, or to prevent the same from being distributed under the act, or to defeat the object of, or in any way impair, hinder, impede or delay the operation and effect of, or to evade any of the provisions of, the act.

On the 23d of August, 1870, the bankrupts, under their firm name of E. P. Sanger & Co. made and delivered to one William H. M. Sanger their check, dated that day, drawn on the Central National Bank of the City of New York, payable to the order of said William H. M. Sanger, for $4,891.64. On the 24th of August, 1870, they made and delivered to said William H. M. Sanger a like check, for $4,651.37. These checks were indorsed and passed by William H. M. Sanger to the defendants, the Tenth National Bank. On presentment at the Central National Bank, payment of them was refused. A suit was brought on each of the checks against the makers and the indorser. The summons and complaint in each of the suits were served on Edmund P. Sanger, on the 3d of November, 1870, and on Walter Scott, on the 29th of November, 1870. A judgment was entered against them, in each suit, for want of appearance and of answer or demurrer, and against William H. M. Sanger, on the 12th of January, 1871, the judgments being severally for the sums of $5,051.01 and $4,803.47. On these judgments the executions referred to were on the same day issued, and the levies made.

When the deputy sheriff made the levies, he made a demand for the money. The debtors said, in reply, that they did not have the money at that time, but expected to get it soon. The sheriff held possession for forty-five days of the property levied on, and it was then sold. The proceeds are in the hands of the sheriff. When the levies were made, part of the property levied on was already under attachment, under process from a state court.

The firm of E. P. Sanger & Co. failed in September, 1870. It did not after that resume general payment of its debts, although it bought a few bills of goods for cash. It did not after that meet any of its obligations except those specially arranged for, and absolutely necessary to carry on its business. It owed, when it failed, from $150,000 to $200,000. The reason why it did not pay the amounts claimed in the suits on the checks was, that it did not have any money. A few days after the executions were levied, according to the bankrupt Sanger's testimony, he, in a conversation with the president of the bank, proposed to pay him $2,500, if he would withdraw the sheriff and vacate the judgments; but the president refused to do so, assigning as a reason that the bankrupts had not settled with all their creditors, and that the bank had to refuse in order to protect itself, but offered to take $3,000 in

cash, and withdraw the sheriff, but not vacate the judgments. Sanger says that this offer was refused by the bankrupts, and that the same offers on both sides were afterwards made and refused several times. The president of the bank testifies, that his offer was to take forty-five per cent. of the claims, and withdraw the sheriff, and wait some time for the remainder. From the time it was so sued, the firm was not able to pay the demands sued on, and it was not, from September, 1870, able to pay its debts in full.

The checks referred to were received on deposit by the bank from William H. M. Sanger, who kept an account with it. After the checks were dishonored, and before suit was brought on them, the president of the bank had an interview in regard to them with the two Sangers. The substance of the conversation was a request for the forbearance of the payment of the checks. One of the reasons assigned for the request was, that Edmund P. Sanger was going on nicely with his business, and expected William H. M. Sanger, who was his brother, to provide for them, and that any pressure on the part of the bank would embarrass Edmund P. Sanger. By reason of promises made for an earlier payment or settlement, the bank refrained from bringing suit. The president was assured by William H. M. Sanger, that his brother was in a most excellent condition; that the firm had failed and had compromised some time previously, but was then going on nicely; and that it had a large stock in process of manufacture, and, as soon as the autumn business opened, would be able to make satisfactory arrangements. After the suit was brought, the two Sangers urged very hard for an extension of time, and it was given.

The president of the bank testifies, that the understanding he derived from his conversation with the bankrupt Sanger, after the levies were made, was, that the firm had some time before compromised with its creditors at forty-five cents on the dollar; and that he had the same understanding when the suits were brought and the judgments were obtained, and was further informed that the compromise would leave them a very handsome surplus, that they had no considerable amount to pay until April, 1871, and that the prospect of their business was excellent. The president of the bank had no knowledge, until after the levies were made, of the existence of any prior attachment on any of the goods levied on. It does not appear that any officer of the bank except the president had anything to do with any of the transactions in question.

Notwithstanding the provision of the 35th section of the act, that, if the challenged transfer or conveyance is not made in the usual and ordinary course of business of the debtor, the fact shall be prima facie evidence of fraud, I do not see in this case any satisfactory evidence that the bank had any reasonable cause to believe that the debtors intended, by suffering the executions to be levied, to give the bank a preference. The bank was put on inquiry by the non-payment of the checks. It made inquiry, and made it in the most proper quarters, as to the status and prospects of the debtors, and as to their relations to other creditors, if any. The evidence rebuts the presumption that the bank intended to obtain, or supposed it was obtaining, a preference over any creditor who had a subsisting enforceable claim at the time; or that the debtors intended to give the bank, or suffer it to have, any such preference; or that the bank had reasonable cause to believe that the debtors had any such intention or view. When the levies were made, the debtors were going on with their business. They continued it for six weeks afterwards, before the petition against them was filed. It does not appear that the levying of the executions broke up their business, or suspended its continuance. Although the firm failed in September, 1870, and did not after that pay its debts in full, yet, during the interval between that time and the levies, it was making compromises as its debts matured, at the rate of forty-five cents on the dollar, to the satisfaction of those who so compromised, and, as I understand the evidence, was disposing of its debts, as they matured, by such compromises. It does not appear that, at the time of the levies, the bank had reasonable cause to believe that there were any creditors not compromised with, and over whom it could obtain a preference. What transpired after the levies were made cannot affect the rights of the parties. The question is as to what the bank had reasonable cause to believe at the time the levies were made. It results, therefore, that the bill must be dismissed, with costs.

[NOTE. The case was taken on an appeal to the circuit court, where the decree of this court was reversed. Case No. 17,202. From the circuit the cause was subsequently appealed to the supreme court, where the decree of the circuit court was reversed, and that of this court, dismissing the bill with costs, affirmed. 96 U. S. 539.]